UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

KAREEM SMITH,                         :

                    Petitioner,       :        01 Civ. 1363 (RCC)(HBP)

        -against-                     :        REPORT AND
                                               RECOMMENDATION
MICHAEL McGINNIS                      :

                    Respondent.       :

----------------------------------X

            PITMAN, United States Magistrate Judge:

            TO THE HONORABLE RICHARD CONWAY CASEY, United States

District Judge,

I.  Introduction

            Petitioner Kareem Smith seeks, by his pro se petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, an

Order vacating a judgment of conviction entered on August 1, 1996

by the New York State Supreme Court, New York County (Gold, J.),

convicting him of attempted murder in the second degree in

violation of New York Penal Law Sections 110.00 and 125.25.

Petitioner was sentenced to an indeterminate term of ten to

twenty years and is currently incarcerated pursuant to the

judgment.

            For the reasons set forth below, I respectfully recom-

mend that the petition be denied.

II.  Facts

    A.  Facts Leading to
        Petitioner's Conviction


        1.  The Prosecution's Case


        On the evening of December 3, 1995, petitioner and
Pauline Lawrence were alone together in her apartment on 101st
Street in Manhattan.  Lawrence and petitioner were friends and
saw each other often, but were not romantically involved (Tr. at
238-39, 266).[1]

        Petitioner arrived at Lawrence's apartment at approxi-
mately 8:00 p.m.  They immediately left together to go to a store
and to purchase some marijuana.  They then returned to the
apartment, smoked the marijuana and talked.  At some point,
Lawrence's boyfriend called her and said he was going to come
over (Tr. at 238-39).

        When Lawrence informed petitioner that her boyfriend
was coming over, he said that he was going to leave (Tr. at 239-
40).  Petitioner put on a brown ski cap and a beige and brown
camouflage army fatigue jacket.  Petitioner was also wearing
construction boots, jeans and a t-shirt (Tr. at 241, 252).

_____

        [1]"Tr." refers to the transcripts of petitioner's trial
provided to the court by respondent, and, unless otherwise
indicated, specifically to the transcripts of proceedings
occurring between June 17, 1996 and June 20, 1996.

Petitioner asked Lawrence for a cigarette. She went to her bedroom to get one and sat on her bed while looking through her purse with her back to the door. Suddenly she felt something hit her in the head very hard. She jumped off the bed, turned around and saw petitioner holding a hammer. She noticed she was bleeding and asked him "why are you doing this" (Tr. at 241-42).

Petitioner did not say anything at first, but then told Lawrence to take off all her jewelry and give it to him. She complied and, although petitioner then stated he was going to leave, he instead went to the living room, turned up the stereo and returned to the bedroom (Tr. at 241-42). Petitioner told Lawrence to lay down on her bed. Fearing that he was either going to kill or rape her, Lawrence ran past petitioner to her front door and out into the hallway of her building. Petitioner chased her as she fled, hitting her head and neck with the hammer several more times (Tr. at 242-43, 299-300). Petitioner also swung the hammer at Lawrence's face; Lawrence raised her hand to block the blow and suffered a broken finger and a lost tooth. While trying to escape, Lawrence was banging on neighbor's doors for help and, at one point, fell to the floor (Tr. at 243-44). Lawrence's clothes were also torn off in the struggle (Tr. at 246).

Finally, someone from an upstairs apartment saw Lawrence and petitioner. Petitioner saw the person looking at them,

dropped the hammer and ran down the steps (Tr. at 244). A resident of the building, who while downstairs taking out garbage heard someone scream "[h]elp; he's killing me; he's going to kill me," saw a "nervous"-looking African-American man with a beige, camouflage army jacket leaving the building moments after hearing the scream (Tr. at 406-08). After petitioner left, Lawrence crawled up the stairs to a neighbor's apartment, and the neighbor called 911 (Tr. at 245, 403-04).

Police officers were informed of the 911 call at approximately 8:45 p.m. and arrived at the apartment building within a minute (Tr. 208-09, 220, 316). The officers heard loud music and proceeded to Lawrence's apartment. They observed blood on the wall and a door and saw that the door to Lawrence's apartment was closed (Tr. at 209). They also saw a large hammer lying on the floor in the hallway, picked it up and noticed it had blood and hair on it (Tr. at 209-10, 316).

The officers banged on Lawrence's apartment door to try to gain entry and then heard screaming from the floor above them. They went upstairs and into another apartment where they observed Lawrence sitting with a blood-soaked towel over her head and blood "pouring" down the sides of her face and onto her chest (Tr. at 215, 313).[2] Lawrence gave the officers a description of

---

[2]Photographs of Lawrence's injuries and her medical records were admitted at trial (Tr. at 351, 391). Lawrence herself and a
(continued...)

her attacker (Tr. at 231, 314).  Several officers left the
building to search for the individual Lawrence had described, but
they were unable to find anyone matching the description (Tr. at
232).

Police Detective Richard Popp was assigned to investi-
gate the attack (Tr. at 325).  Because of Lawrence's condition,
he was unable to interview her until December 4, the day after
the attack.  Lawrence gave Popp a description of petitioner and
petitioner's address and phone number, and Popp proceeded to
petitioner's apartment on 104th Street in Manhattan (Tr. at 328-
329, 358).  Popp spoke with Elizabeth Williams at the apartment
who stated that she owned the apartment and that petitioner, who
was her cousin, lived with her, but was not then home (Tr. at
329, 361).  Popp observed a brown camouflage army jacket in plain
view inside an open closet in the apartment that matched the
description of the jacket Lawrence stated her attacker was
wearing (Tr. at 330-32).  Williams gave Popp permission to take
the jacket (Tr. at 365).[3]  When he picked it up, Popp noticed the
jacket had a blood stain on its sleeve (Tr. at 321-32).

---

[2](...continued)
treating physician, Doctor Charles Knibb, also gave testimony
regarding her injuries (Tr. at 249-51, 393-95).

[3]The jacket was admitted as evidence at trial.  Lawrence and
the neighbor-eyewitness identified the jacket as the one they saw
the attacker was wearing (Tr. at 253, 407).  Further, petitioner
admitted the jacket was his (Tr. at 491-92).

While Popp was still in Williams' apartment, petitioner's parole officer called Williams and, after listening in on the call, Popp spoke with him and learned that petitioner was meeting with the parole officer in Brooklyn.  Popp told the parole officer to detain petitioner until Popp could get there. When Popp arrived, he arrested petitioner and took him to the 23rd Precinct (Tr. at 333-34, 444-45).[4]

Petitioner was placed in an interview room and, after Popp read petitioner his <u>Miranda</u> rights, signed a statement acknowledging his receipt and understanding of the rights.  The acknowledgment stated, in part, that petitioner had a right to an attorney and that he could remain silent until he consulted with an attorney.  It also asked "'Now that I've advised you of your rights, are you willing to answer questions?,'" to which petitioner answered "'yes'" (Tr. at 334-38).

Petitioner did not immediately answer Popp's questions, but, later that evening, he made an oral statement concerning the attack that he subsequently reduced to writing (Tr. at 338-39):

> I woke up at 11 o'clock and went to 116th Street and bought four bags of crack worth three dollars a piece.  Then, I went to 110th Street, bought two bags of weed, and then, went to 112th Street, and bought two different bags of weed.  So, I went home, took a shower, got dressed, and I went in the park across the street, and started to mix the crack and weed; then

---

[4]The facts that petitioner was on parole and met with his parole officer immediately before his arrest were not disclosed to the jury until petitioner testified (Tr. at 444-45).

smoke it.  After I finished, I went upstairs to my
house at 60 East 104th Street, and then, I started to
play cards with my girlfriend.  We played cards until
about five o'clock.  That's when Pauline called me and
asked me to come over.

So, I went over, and when I got there, she was
getting dressed, and she told me that someone had
called her; and she was about to go get some money, and
she would bring some weed back.  So, I went around the
corner and bought a dime of coke, and went to my
building and sniffed it in the elevator; then, [sic]
went back in the house and continued to play cards with
my girlfriend.

But, while I was at Pauline's house, we started to
talk about her boyfriend, and she was saying that the
only way she could get rid of him is if she killed him.
She said that he "act" like he don't want her, but when
she show[s] interest in someone else, he wants to fight
her and the person or persons she talks to.  We started
laughing, and she said she feel like beating him in his
head with a hammer.  And I just looked at her.  So, she
asked me did I have a hammer; I said "yes" because she
knew when he came in the house, that she and him would
argue and fight.  Then, I turned to go to turn on the
radio and saw a hole in the wall.  I asked her what
happened.  She said her boyfriend did it, so I smoked a
cigarette and went to get the hammer.

I came back; we went down to the store to buy some
weed and two cigars; went back upstairs, and started to
smoke the weed and listen to the music.  I was feeling
number [sic] and high, so I just got up and started
dancing.  Her boyfriend called and said he was coming
over, but he was going to call her when he was on his
way.  So, she started to clean the house, and I was
feeling funny and felt like I had no control over my
body.  The phone rung [sic]; it was her boyfriend.  He
said he would be there in 15 minutes.  So, I asked for
a cigarette, and she started to laugh, and asked me why
I was looking at her like that.  I couldn't respond
because I did not know what was going on.

Next thing I know, I hit her three times in the
head and she was bleeding.  And I was standing, holding
the hammer.  I think we had a little struggle, and we
made it to the hallway, where I began to swing the

hammer until I realized what I was doing.  I was
sweating; I dropped the hammer and ran.  I was trying
to piece together what happened, but at the time, I
couldn't, so I went home to take off my jacket; put on
a different one, and went to Brooklyn to get my hair
braided.  After I got my hair braided, the girl who
braided my hair walked me to the train station.  Then,
I got on the train and went home.

I got home about 2:30 a.m.  I began to play cards
with my girlfriend, and looking at my baby cousin walk.
But, then, I started to get tired, so I went to bed.  I
woke up in the morning; took a shower, and drunk [sic]
a cup of tea called Quick Rush or Crush.  It's supposed
to clean out your system.  Then, I left my house and
got on the train at about 9:30 a.m. in the morning.  I
was drinking a lot of water to clean out my system, and
using the bathroom until I had to go see Mr.
Weinstein.[5]  He was not there, so I left and bought
some weed from the weed spot, [sic] smoked it; went to
a job interview on 29th Street.  They told me to come
back the next day at eight a.m.  So, I reported back to
Mr. Weinstein, where they held me until the detectives
came and picked me up.

/s/ Kareem Smith

12-4-95, 11:30 p.m.

(Tr. at 347-49 (footnote added)).

2.  The Defense's Case

Petitioner testified in his own defense.  He

acknowledged knowing Lawrence for several months prior to the

attack and that he was in her apartment on December 3, 1995.

However, he testified that he left her apartment around 6:45 or

7:00 p.m., before the attack took place, and that he never

---

[5]Weinstein was petitioner's parole officer (Tr. at 444-45).

8

attacked her (Tr. at 425-26, 430, 435).  After leaving, he went
to his cousin Williams' apartment a few blocks away where he saw
his girlfriend, Shamika Smith,[6] and Williams, and then went to
his friend Latesha Tucker's apartment in Brooklyn to have his
hair braided (Tr. at 439-40).  He arrived at the Tucker residence
around 8:30 and testified that several people saw him there
including Latesha, Sabrina Tucker, Cookie Tucker, Shawn Tucker,
Juan Derrick Tucker, and Juan Derrick's girlfriend "Keisha."  He
left the Tuckers around 1:00 a.m. on December 4 (Tr. at 421-42).
Petitioner also testified that on December 3 he wore blue pants,
a blue and cream leather Guess jacket, brown boots and no hat
(Tr. at 429).

        He further testified that he and Lawrence were involved
in check and credit card scams in which they would fraudulently
obtain money and goods by using either false credit card numbers
or checks from accounts with zero balances.  Petitioner claims
the two engaged in such a scam in mid-November and attempted to
acquire thousands of dollars worth of clothing and jewelry.  They
never received the goods, but, petitioner claimed, Lawrence was
under the mistaken impression that petitioner had received them
and that he was withholding them from her (Tr. at 436-39).

---

[6]Shamika Smith and petitioner are not related (Tr. at 498).
Because of their common name, Shamika Smith will be referred to
as "Shamika."

Petitioner theorized that perhaps this was why Lawrence was now claiming he attacked her (Tr. at 484).

On December 4, 1995, petitioner went to see his probation officer. He was then on probation for an armed robbery conviction (Tr. at 444). He stayed in the probation officer's office for several hours and was then informed that he would be held there because officers from the 23rd Precinct wanted to speak with him (Tr. at 448-51). Detective Popp arrived, placed petitioner in handcuffs and took him down to Popp's car. Popp never told petitioner he was under arrest. While in the car, Popp questioned petitioner about his whereabouts the previous day (Tr. at 451-53).

Popp drove petitioner back to the precinct and interviewed him. Over the course of several hours, Popp continuously asked petitioner to give a statement about what happened on December 3, but petitioner denied doing anything and requested a lawyer (Tr. at 455-56). Without consulting a lawyer, petitioner eventually agreed to write a statement about the events. Petitioner stated, however, that he did not know what to write, so Popp recounted Lawrence's version of the events and petitioner wrote what Popp told him (Tr. at 460-65). Petitioner also testified that he wrote the statement in part from his own memory and that he fabricated some of it to make it seem more convincing. He wrote it, he said, in the hope of making a deal

with the district attorney, not because it was true.  When
petitioner finished writing, Popp read the statement over and
told petitioner to insert "I hit her three times in the head"
(Tr. at 474-82).

Petitioner testified that it was only after signing the
statement that he was given the <u>Miranda</u> form described above, and
that he signed it at that time.  He was never read his <u>Miranda</u>
rights (Tr. at 467-70, 474).

Petitioner's cousin, Williams, also testified for the
defense.  Notably, Williams testified that she left her house in
the early morning on December 3, 1995 and did not come back until
after midnight (Tr. at 498-99).  This contradicted petitioner's
testimony that he saw her in her apartment after he left
Lawrence's apartment but before going to the Tucker apartment
(Tr. at 440).

Williams further testified that she was home when
Detective Popp came to her apartment looking for petitioner on
December 4.  She claimed that she let him and other officers into
the apartment and allowed them to take petitioner's jacket
because they claimed they had a warrant, although they never
showed her one (Tr. at 504, 508, 518).  Popp did not in fact have
a warrant.  But for the putative warrant, she testified that she
would not have let the police into her apartment or allowed them
to take the jacket even though, at the time, she was furious with

petitioner and was seeking an order of protection against him (Tr. at 503, 511). She also claims that the door to the closet the jacket was in was closed and that, when the police took it out, she did not see a blood stain on it (Tr. at 505, 507, 519).

Petitioner also intended on calling Shamika to the stand. However, despite leaving her several messages and personally serving a subpoena upon her, petitioner's counsel was unable to present her at trial (Tr. at 524-32, 548-49).

### 3. The Verdict

Although petitioner was indicted on five counts, namely attempted murder in the second degree, assault in the first degree, two counts of robbery in the first degree for serious physical injury and use of a dangerous instrument and criminal possession of a weapon in the fourth degree (Respondent's Memorandum of Law in Support of Answer to Petition for a Writ of Habeas Corpus ("Resp. Memo.") at 2 (Docket Item 5)), only the attempted murder count and one robbery count, for use of a dangerous instrument, were submitted to the jury (Tr. at 539-44). The jury convicted petitioner of attempted murder in the second degree and acquitted him on the robbery count (Tr. at 642).

B.  <u>Procedural History</u>

        Petitioner unsuccessfully moved to suppress the jacket
and post-arrest written statement in a pre-trial Mapp/Huntley
hearing.  With respect to the jacket, petitioner argued that the
jacket was unlawfully seized and that Popp had no right to search
Williams' apartment (6/13/96 Tr. at 106, 109).[7]  With respect to
the statement, petitioner argued that he was not given his
Miranda warnings until after he made the statement, that he
requested an attorney several times before making the statement
and that the statement he wrote was not from his own recollection
but from Popp's recounting of a statement Lawrence made (6/13/96
Tr. at 76-82, 106-07, 109).

        Petitioner appealed his conviction to the Appellate
Division of the New York State Supreme Court, First Department,
arguing:  (1) petitioner was denied his rights to remain silent,
Due Process and to the "guiding hand of counsel" when the trial
court required him to testify, if he chose to testify, before any
other defense witness (Brief for Defendant-Appellant ("App. Div.
Br.") at 16-22, annexed as Exhibit A to Appendix in Support of
Answer to Petition for a Writ of Habeas Corpus ("Resp. App.")
(Docket Item 5)); (2) the Trial Court abused its discretion and

---

[7]Williams' testimony that she only permitted Popp to search
her apartment and take the jacket because he claimed to have a
warrant was not elicited until trial because only Popp and
petitioner testified at the suppression hearing.

denied petitioner Due Process by not permitting the jury to consider the charge of assault in the first degree (App. Div. Br. at 23-29), and (3) petitioner was denied his Due Process right to a fair trial when the Trial Judge suggested that petitioner was the perpetrator during a supplemental instruction even though identity was at issue in the case (App. Div. Br. at 30-34).

The Appellate Division unanimously affirmed petitioner's conviction on April 20, 1999. The Appellate Division held that (1) requiring defendant to testify before any other defense witness, assuming he chose to testify, was a proper exercise of discretion and petitioner's decision was made with the assistance of counsel, (2) the Trial Court's decision not to submit the charge of assault in the first degree to the jury was a proper exercise of its discretion, and (3) the supplemental instruction considered as a whole with the main charge could not have misled the jury to believe identity was no longer an issue. People v. Smith, 260 A.D.2d 253, 253-54, 690 N.Y.S.2d 6, 7-8 (1st Dep't 1999). The New York State Court of Appeals denied petitioner's leave to appeal on July 6, 1999, People v. Smith, 93 N.Y.2d 1006, 717 N.E.2d 1089, 695 N.Y.S.2d 752 (1999), as well as his pro se application for reconsideration on November 1, 1999, People v. Smith, 94 N.Y.2d 829, 724 N.E.2d 392, 702 N.Y.S.2d 600 (1999).

On January 5, 2000, petitioner filed a pro se motion
pursuant to New York Criminal Procedure Law Section 440.10
seeking to vacate the judgment of conviction, arguing that (1) he
received ineffective assistance of counsel based on counsel's
failure to (a) produce petitioner's witnesses, (b) tell
petitioner he had a right to present witnesses at the pre-trial
hearings, (c) investigate petitioner's case, (d) submit the
statement of an alibi witness who did not appear at trial despite
being called to testify,[8] and (e) request a lesser included
offense charge, (2) physical evidence used at trial was obtained
by an unlawful search and seizure, and (3) his post-arrest
statement was unlawfully obtained and should have been ruled
inadmissible (Motion to Vacate Judgment).  In denying the motion,
the Court stated that the claims were either "reviewable by the
Appellate Division upon the record (CPL 440.10[2][c]), or were
previously determined on the merits upon appeal from the judgment
(CPL 440.10[2][a])" (Decision and Order of the Honorable Dora L.
Irizarry, Justice of the Supreme Court, dated February 17, 2000
("440.10 Order"), annexed to Resp. App. as Exhibit K).  Leave to

---

[8]It appears that petitioner believed that his counsel
possessed an exculpatory written statement or affidavit from an
alibi witness.  Because the witness did not appear in court to
testify, petitioner claimed that his counsel was ineffective for
failing to submit this statement into evidence (Motion to Vacate
Judgement ("Motion to Vacate Judgment"), annexed to Resp. App. as
Exhibit J).

appeal the decision was denied on July 13, 2000 (Certificate Denying Leave, annexed to Resp. App. as Exhibit O).

Petitioner filed his petition for a writ of habeas corpus on December 5, 2000.

C.  Petitioner's Claims

Petitioner asserts five claims in his petition:  (1) petitioner received ineffective assistance of trial counsel because trial counsel failed to (a) investigate and call witnesses supporting petitioner's alibi defense, (b) investigate and call additional witnesses during pre-trial hearings, (c) proffer exculpatory documentary evidence and alibi witness statements, (d) review and impeach witnesses with grand jury testimony, (e) discuss trial strategy with petitioner, and (f) request submission of a lesser included offense to the jury (Petition ¶ 12(C) (Docket Item 1) ("Petition")); (2) petitioner was denied his rights to remain silent, Due Process and "the guiding hand of counsel" when the Trial Judge forced him to testify, assuming he chose to testify, before any other defense witness (Petition ¶ 12(A)); (3) the Trial Judge's supplemental instruction denied petitioner of Due Process (Petition ¶ 12(B)); (4) petitioner's post-arrest statement was obtained in violation of his privilege against self-incrimination (Petition ¶ 12(D)),

and (5) petitioner's jacket was obtained through an unlawful
search and seizure (Petition ¶ 12(E)).

D. Evidentiary Hearing

On February 24, 2004, I ordered that an evidentiary
hearing be held concerning petitioner's claim that he received
ineffective assistance of counsel based on counsel's failure to
offer alibi witnesses. Smith v. McGinnis, 01 Civ. 1363
(RCC)(HBP), 2004 WL 350755 (S.D.N.Y. Feb. 24, 2004).[9]  Pursuant
to the Order, an evidentiary hearing was held on November 15,
2004.  I also appointed petitioner counsel solely to represent
him on the issue addressed in the hearing.

Petitioner called Latesha, Sabrina and Juan Derrick
Tucker to testify at the hearing.[10]  Latesha testified that,
while she did not recall the exact date the attack on Lawrence
took place because it occurred approximately ten years ago, she
did recall that petitioner arrived at her apartment between 5:00
and 8:30 on the evening of the attack (11/15/04 Tr. at 27).  She
claimed petitioner was with her for at least four hours since she
was braiding his hair, which takes at least four hours to do

_____

[9]My Opinion and Order also denied petitioner's request to
amend his petition.  Smith v. McGinnis, supra, 2004 WL 350755.

[10]Because multiple members of the Tucker family testified at
the November 15 hearing, for simplicity they will be referred to
by their first names.

(11/15/04 Tr. at 25). Further, Latesha stated that after petitioner was arrested, she did not speak with him. This contradicted Detective Popp's notes stating that when Popp interviewed Latesha, she stated that petitioner had called her from jail to have her tell the district attorney that he had arrived at her house around 5:00 p.m. on December 3 (Notes of Detective Richard Popp, Petitioner's Exhibit 1). She also testified that although she was interviewed by police officers after the December 3 attack, she was never interviewed by petitioner's counsel or an investigator working for petitioner's counsel (11/15/04 Tr. at 19).

Sabrina Tucker, Latesha's mother, testified that she was unsure of when she last saw petitioner, however, she vaguely recalled that the last time she saw him he arrived either in the early morning or the late afternoon, after school (11/15/04 Tr. at 34-35). Both Sabrina and Juan Derrick, Sabrina's nephew, also testified that although they too were interviewed by the police after the attack, they were never interviewed by petitioner's counsel or an investigator working on behalf of petitioner (11/15/04 Tr. at 32, 40).[11]

---

[11]Although petitioner's trial counsel, Hershel Katz, Esq., testified for respondent, the details of his testimony are not relevant to my report.

III.  Analysis

A.  Standard of Review

Where the state court has addressed a habeas petitioner's claims on the merits, a habeas petitioner must meet a stringent standard before a federal court can issue the writ. Specifically, 28 U.S.C. § 2254(d) provides that in such a situation, habeas relief may be granted only when the Trial Court's decision

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has explained the alternative standards contained in the former paragraph as follows:

> First, we have explained that a decision by a state court is "contrary to" our clearly established law if it "applies a rule that contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Williams v. Taylor, 529 U.S. 362, 405-406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). See also Early v. Packer, 537 U.S. 3, 7-8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam). . . .
>
> Second, respondent can satisfy § 2254(d) if he can demonstrate that the [State] Court's decision involved an "unreasonable application" of clearly established law. As we have explained:

> "[A] federal habeas court may not issue the writ
> simply because that court concludes in its
> independent judgment that the state-court decision
> applied [a Supreme Court case] incorrectly. See
> Bell v. Cone, 535 U.S. 685, 698-699, 122 S.Ct.
> 1843, 152 L.Ed.2d 914 (2002); Williams, supra, at
> 411, 120 S.Ct. 1495. Rather, it is the habeas
> applicant's burden to show that the state court
> applied [that case] to the facts of his case in an
> objectively unreasonable manner."

Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S.Ct.
357, 154 L.Ed.2d 279 (2002) (per curiam).

Price v. Vincent, 538 U.S. 634, 640-41 (2003); accord Brown v.
Payton, 544 U.S. 133, --, 125 S.Ct. 1432, 1438 (2005); see also
Lockyer v. Andrade, 538 U.S. 63, 70-72 (2003); Brown v. Artuz,
283 F.3d 492, 500-01 (2d Cir. 2002).

In addition to the description of "unreasonable
application" set forth above, a state court may unreasonably
apply Supreme Court precedent "if the state court unreasonably
extends a legal rule established by the Supreme Court or if it
unreasonably fails to extend a legal rule to a context in which
the rule reasonably should apply." Serrano v. Fischer, 412 F.3d
292, 296-97 (2d Cir. 2005), cert. denied, 126 S.Ct. 1357 (2006).

"Unreasonableness is determined by an 'objective'
standard." Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir.
2005), petition for cert. filed, 74 USLW 3476 (No. 05-1019) (U.S.
Feb. 9, 2006), quoting Williams v. Taylor, 529 U.S. 362, 409
(2000). In order for a state court's application of Supreme
Court precedent to be unreasonable, "[s]ome increment of

incorrectness beyond error" is required.  <u>Henry v. Poole</u>, 409
F.3d 48, 68 (2d Cir. 2005) (internal quotation marks omitted),
<u>cert</u>. <u>denied</u>, 126 S.Ct. 1622 (2006); <u>accord</u> <u>Brown v. Artuz</u>,
<u>supra</u>, 283 F.3d at 500-01; <u>Aparicio v. Artuz</u>, 269 F.3d 78, 94 (2d
Cir. 2001).  However, "the increment need not be great; otherwise
habeas relief would be limited to state court decision 'so far
off the mark as to suggest judicial incompetence.'"  <u>Francis S.
v. Stone</u>, 221 F.3d 100, 111 (2d Cir. 2000), <u>quoting</u> <u>Matteo v.
Superintendent, SCI Albion</u>, 171 F.3d 877, 889 (3d Cir. 1999) (<u>en
banc</u>); <u>accord</u> <u>Gersten v. Senkowski</u>, <u>supra</u>, 426 F.3d at 607.
Finally, the nature of the rule in issue also impacts the
assessment of the reasonableness of the state court's action.

> [W]hile very specific rules may not permit much leeway
> in their interpretation, the same is not true of more
> general rules, the meaning of which "must emerge in
> application over the course of time."  [<u>Yarborough v.
> Alvarado</u>, 541 U.S. 652, 124 S.Ct. 2140, 2149 (2004)].
> "The more general the rule, the more leeway courts have
> in reaching outcomes in case by case determinations."
> <u>Id</u>.

<u>Serrano v. Fischer</u>, <u>supra</u>, 412 F.3d at 297.

Both the "contrary to" and "unreasonable application"
clauses "restrict[] the source of clearly established law to [the
Supreme] Court's jurisprudence."  <u>Williams v. Taylor</u>, <u>supra</u>, 529
U.S. at 412.  "That federal law, as defined by the Supreme Court,
may either be a generalized standard enunciated in the [Supreme]
Court's case law or a bright-line rule designed to effectuate
such a standard in a particular context."  <u>Kennaugh v. Miller</u>,

289 F.3d 36, 42 (2d Cir. 2002). "A petitioner cannot win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d 104, 109 (2d Cir. 2003); accord DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002).

In order to be entitled to the deferential standard of review, the state courts must have resolved a petitioner's claims "on the merits." Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003). "A state court adjudicates a claim 'on the merits' for purposes of § 2254(d) when it '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment . . . . even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.'" Serrano v. Fischer, supra, 412 F.3d at 296, quoting Gutierrez v. McGinnis, 389 F.3d 300, 304 (2d Cir. 2004). A state court's summary statement that a claim is "without merit," without further explanation, constitutes an adjudication on the merits for purposes of § 2254(d). Serrano v. Fischer, supra, 412 F.3d at 296; see Howard v. Walker, 406 F.3d 114, 122 (2d Cir. 2005).

When the state court has not resolved a habeas petitioner's claim on the merits, the state court's decision is subject to de novo review. Cotto v. Herbert, supra, 331 F.3d at 230; Diaz v. Herbert, 317 F. Supp.2d 462, 470 (S.D.N.Y. 2004).

Because the same standard of review is not applicable to each of petitioner's claims, I shall address which standard is applicable to each claim in connection with my discussion of each claim.

B.  Petitioner's Claims

1.  Ineffective Assistance
    of Counsel

Petitioner claims that his trial counsel was ineffective for failing to (1) investigate and call witnesses supporting petitioner's alibi defense, (2) investigate and call additional witnesses during pre-trial hearings, (3) proffer exculpatory documentary evidence and alibi witness statements, (4) review and impeach witnesses with grand jury testimony, (5) discuss trial strategy with petitioner, and (6) request submission of a lesser included offense to the jury (Petition ¶ 12(C)).  These claims should all be denied on the merits.

In order to prevail on an ineffective assistance of counsel claim, a habeas petitioner must meet the now-familiar two-part test set forth in Strickland v. Washington, 466 U.S. 668, 686-87 (1984):

> The benchmark for judging any claim of inef-
> fectiveness must be whether counsel's conduct so
> undermined the proper functioning of the adversarial
> process that the trial cannot be relied on as having
> produced a just result.

. . . .

A convicted defendant's claim that counsel's
assistance was so defective as to require reversal of a
conviction . . . has two components. First, the
defendant must show that counsel's performance was
deficient. This requires showing that counsel made
errors so serious that counsel was not functioning as
"counsel" guaranteed by the Sixth Amendment. Second,
the defendant must show that the deficient performance
prejudiced the defense. This requires showing that
counsel's errors were so serious as to deprive the
defendant of a fair trial, a trial whose result is
reliable. Unless a defendant makes both showings, it
cannot be said that the conviction . . . resulted from
a breakdown in the adversary process that renders the
result unreliable.

Accord Davis v. Greiner, 428 F.3d 81, 87 (2d Cir. 2005); Greiner

v. Wells, 417 F.3d 305, 319 (2d Cir. 2005), cert. denied, 126

S.Ct. 1363 (2006); Aeid v. Bennett, 296 F.3d 58, 62-63 (2d Cir.

2002); Hernandez v. United States, 202 F.3d 486, 488 (2d Cir.

2000); Guerrero v. United States, 186 F.3d 275, 281-82 (2d Cir.

1999); McKee v. United States, 167 F.3d 103, 106-07 (2d Cir.

1999); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998).

In determining whether counsel's performance was

objectively deficient, courts "must indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the [petitioner] must overcome

the presumption that, under the circumstances, the challenged

action might be considered sound trial strategy." Strickland v.

Washington, supra, 466 U.S. at 689 (internal quotation marks

omitted).

24

The second prong of the test -- actual prejudice -- requires that the petitioner show that, but for trial counsel's errors, there is a "reasonable probability" that the result of the trial would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, supra, 466 U.S. at 694.

Finally, because the test is conjunctive, a habeas petitioner's failure to satisfy either prong requires that the challenge to the conviction be rejected. Strickland v. Washington, supra, 466 U.S. at 697.

As noted above, petitioner's ineffective assistance claim was first made after trial in a Section 440.10 motion and rejected as unpreserved, the state Court reasoning that it could have been raised on petitioner's direct appeal but was not.[12] Ordinarily, the rejection of a Section 440.10 motion on this ground would give rise to a procedural bar that would prevent the petitioner from asserting the claim by way of a habeas corpus petition in the absence of cause and prejudice or a showing of a fundamental miscarriage of justice. Ramirez v. Attorney Gen.,

---

[12]In rejecting petitioner's 440.10 motion, the Court stated that "Defendant's claims in the instant motion either were reviewable by the Appellate Division upon the record (CPL 440.10[2][c]), or were previously determined on the merits upon appeal from the judgment (CPL 440.10[2][a])" (440.10 Order). Petitioner's direct appeal in no way raised an inffective-assistance claim, and, therefore, the Court must have rejected the motion as procedurally barred by Section 440.10(2)(c) on the ground that it could have been raised on direct appeal.

280 F.3d 87, 96 (2d Cir. 2001) (denial of a 440.10 on the ground that claim could have been raised on direct appeal is a denial pursuant to state law that gives rise to a procedural bar); Spence v. Superintendent, Great Meadow Corr. Facility, 219 F.3d 162, 170 (2d Cir. 2000) (same); see generally Coleman v. Thompson, 501 U.S. 722, 731-32 (1991); Rivera v. Moscicki, 03 Civ. 5810 (SAS); 2005 WL 2347840 at *2-*3 (S.D.N.Y. Sept. 22, 2005).  Respondent does not, however, assert that these claims are procedurally barred.  Accordingly, the defense is waived. Gray v. Netherland, 518 U.S. 152, 165-66 (1996) (procedural bar is an affirmative defense that is waived if not asserted).

Because the state courts never ruled on the merits of petitioner's ineffective-assistance claims, they are subject to de novo review.  Nevertheless, notwithstanding the application of this most liberal standard of review, the claims still fail on the merits.

> a.  Failure to Investigate
>     Alibi Defense and Call Alibi
>     Witnesses at Trial

Petitioner first claims that his counsel was ineffective for failing to interview, investigate and call witnesses pertaining to an alibi defense.  Although he admitted to visiting Lawrence in her apartment earlier in the day she was attacked, petitioner claims that he was at the Tucker residence

at the time of the attack and that several people there would have testified to that fact had they been called by petitioner's counsel.  There is no need to decide whether petitioner's counsel was ineffective for failing to investigate petitioner's alibi and call alibi witnesses because, in light of the overwhelming evidence presented at trial, petitioner has failed to show he was prejudiced by counsel's performance.

"Even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt."  Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001); see Gersten v. Senkowski, supra, 426 F.3d at 611; Baskerville v. Dennison, 04 Civ. 10261 (PKC), 2005 WL 3535067 at *12 (S.D.N.Y. Dec. 27, 2005); see also Strickland v. Washington, supra, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

The evidence of petitioner's guilt was overwhelming. First, it was uncontested that Lawrence was attacked by someone with a hammer on December 3, 1995.  Second, Lawrence, who had known petitioner for several month prior to the attack, identified petitioner as her assailant.  This is not a case where the culprit was a complete stranger to the victim and later identified in a police line-up or photo array.  Lawrence saw petitioner often and, on that night, had been with petitioner for

some time on the evening she claims he attacked her.  Third, Lawrence and another witness testified that the assailant was wearing an army fatigue coat, and an army fatigue coat with human blood on it that matched the descriptions given by Lawrence and the witness was recovered from the apartment where petitioner was staying.  Petitioner admitted at trial that the jacket was his. Fourth, in a signed, written statement petitioner wrote that he hit Lawrence on the head several times with a hammer.  Fifth, while testifying, petitioner theorized that Lawrence had decided to implicate him for the attack in retaliation for his taking all the proceeds of a fraud scheme the two had concocted (Memorandum of Law in Support of Kareem Smith's Petition for a Writ of Habeas Corpus ("Pet. Counseled Memo.") at 41 (Docket Item 23)).[13]  To suggest that Lawrence would implicate petitioner for the assault as revenge for his taking her share of the proceeds of this alleged scheme, and thereby let the actual assailant go free, is ludicrous.  Sixth, Lawrence immediately told police she was attacked by petitioner and gave them a description of him. Lawrence's prompt report that petitioner was the attacker further removes the possibility that she falsely implicated petitioner. Finally, petitioner was not a credible witness.  For example, he claimed that he concocted part of the post-arrest statement and

_____

[13]Petitioner also suggests that perhaps Lawrence's boyfriend was the attacker (Pet. Counseled Memo. at 41-42).  However, there is absolutely no evidence to support this allegation.

then contradicted its facts, leaving the jury with two versions of the events of December 3. He also contradicted his own witness, Williams, by saying he saw her in her apartment in the early evening of December 3, while she testified that she was not home at that time.

There was little exculpatory evidence offered at trial and the exculpatory evidence petitioner claims his counsel improperly failed to proffer does not raise "a reasonable probability that . . . the factfinder would have had a reasonable doubt respecting guilt." Henry v. Poole, supra, 409 F.3d at 63-64. Petitioner's claim that counsel failed to investigate and proffer an alibi defense is unavailing. Although Latesha testified before me that petitioner was in her home at approximately the same time as the attack, she did not remember the specific day petitioner was in her house as it had been almost ten years since the attack. But, even if she had been called as a witness at petitioner's trial and testified that petitioner had been with her, her testimony was subject to impeachment and, in light of other testimony, probably would not have been found credible.

First, if Latesha had testified at trial that she never received a telephone call from petitioner while he was in jail telling her to say to the district attorney that petitioner was at her apartment at 5:00 p.m. on December 3, she could have been

impeached by Detective Popp's testimony that she had admitted to him that she had received such a telephone call. Second, because Latesha and petitioner were dating at the time of the attack (11/15/04 Tr. at 16), she was biased toward petitioner. Finally, the trial testimony and other evidence implicating petitioner were far more convincing than Latesha's testimony. There was no reason for the prosecution's witnesses to lie, and when they testified in 1996, the events were fresh in their minds. Furthermore, the witnesses corroborated each other, and the physical evidence, namely petitioner's blood-stained jacket, was consistent with their testimony.

Latesha appears to be the only person who would have come forward to testify that petitioner was at the Tucker residence on the night in question. The two other witnesses who testified for petitioner at the hearing either did not recall when petitioner was at their house, gave contradictory testimony or were not asked by petitioner's counsel where petitioner was and when. Sabrina, Latesha's mother, did not recall what time, if ever, petitioner arrived on the night of the attack, although she believed that the last time she saw him, he came to have his hair braided by Latesha and arrived either in the morning or after school (11/15/04 Tr. at 34-35). However, her recollection contradicts petitioner's own testimony at trial that he was at Lawrence's apartment in the late afternoon and arrived at the

Tucker residence in the early evening (Tr. at 442). Sabrina's nephew, Juan Derrick, did not testify as to when, if ever, petitioner was in the Tucker residence (11/15/04 Tr. at 36-43). Popp's notes also indicate that the other people present at the Tucker house either did not recall when he arrived or whether he was even there that evening (Popp Notes; 11/15/04 Tr. at 68-69).[14]

In light of the weight of the prosecution's evidence, there is no reasonable probability that had petitioner's counsel investigated the alibi and called Latesha to testify at trial, it would have created a reasonable doubt with respect to petitioner's guilt. See Bridges v. United States, 04 Civ. 2715 (HB), 2005 WL 1798084 at *4 (S.D.N.Y. Aug. 1, 2005) (no prejudice where petitioner proffered no proof of alleged alibis and substantial evidence indicated the verdict would not have been different had petitioner's counsel investigated potential alibi witnesses); Kanani v. Phillips, 03 Civ. 2534 (PKC)(AJP), 2004 WL

_____

[14]Popp's notes indicate that Juan Derrick recalls petitioner leaving the Tucker residence around 1:00 a.m. on December 4. Petitioner infers from this and Latesha's testimony that it takes four hours to braid petitioner's hair, that petitioner must have arrived at the Tucker's by 9:00 p.m. on December 3 (Pet. Counseled Memo. at 42-43). This brief notation however, coupled with the uncertainty of whether Juan Derrick would have testified to this fact at trial (he was not asked at the hearing whether he remembers petitioner being at his apartment on December 3 and if so what time he left), does not add enough support to Latesha's contention that petitioner had arrived around 8:30 p.m. to find the alibi credible.

2296128 at *32 (S.D.N.Y. Oct. 13, 2004) (Report and
Recommendation), <u>adopted</u>, 2005 WL 2431416 (S.D.N.Y. Oct. 3, 2005)
("[D]ue to the overwhelming evidence of [petitioner's] guilt, it
is unlikely that additional investigation would have affected the
outcome of the trial." (citations omitted)); <u>Rodriguez v.
Senkowski</u>, 03 Civ. 3314 (LAP)(AJP), 2004 WL 503451 at *41
(S.D.N.Y. Mar. 15, 2004) (Report and Recommendation) ("[I]n light
of the extremely strong evidence against [petitioner] . . . any
deficiency by counsel still would not satisfy the second
<u>Strickland</u> prong[] of showing that [petitioner] was
prejudiced.").  Therefore, petitioner was not prejudiced by
counsel's alleged deficiencies, and this aspect of his
ineffective assistance of counsel claim must fail.

> b.  Remaining Ineffective-
>     <u>Assistance Claims</u>

Petitioner's remaining ineffective-assistance claims
are meritless.

First, petitioner claims that counsel was ineffective
for not conducting a proper investigation prior to or calling
witnesses during petitioner's <u>Mapp</u>/<u>Huntley</u> hearing, leading to
the admissibility of both the jacket and post-arrest statement.
Even assuming counsel was deficient in failing to investigate and
call witnesses during the <u>Mapp</u>/<u>Huntley</u> hearing, petitioner was
not prejudiced by counsel's performance.  As discussed in Part

III.B.1.a, <u>supra</u>, the evidence against petitioner was overwhelming. To suggest that the Trial Judge would have suppressed the jacket and statement had petitioner's counsel performed more proficiently is speculative. However, even if the Judge had suppressed the jacket and the statement, the remaining evidence in the case, in particular the victim's prior knowledge of petitioner and her identification of him as the attacker, was still so overwhelming that the suppression of the jacket or statement would not have affected the outcome of the trial. Therefore, petitioner was not prejudiced by counsel's performance during the pre-trial hearings.

Petitioner next claims that counsel was ineffective for failing to proffer certain exculpatory evidence, namely (1) a lab report that showed petitioner's jacket had human blood on it but was inconclusive as to what blood type it was, (2) the fact that the hammer did not have petitioner's fingerprints on it, and (3) a statement by one of petitioner's alibi witnesses (Petition ¶ 12(C)). As I stated in my Order denying petitioner's motion to amend the petition, "[t]he lab report in issue was neutral; it neither inculpated nor exculpated petitioner. Given its inherently ambiguous nature, counsel's failure to offer evidence concerning the report could not have prejudiced petitioner." <u>Smith v. McGinnis</u>, <u>supra</u>, 2004 WL 350755 at *2. The evidence concerning the lack of fingerprints on the hammer is equally

ambiguous and, therefore, petitioner was not prejudiced by counsel's failure to offer evidence concerning it either.  As for the alleged alibi witness statement, petitioner does not explain what statement he is referring to.  Assuming he is referring to a statement by someone at the Tucker residence, the failure to admit such a statement, assuming such a statement was even admissible, would have had even less of an impact on the jury as an alibi witness and, once again, did not prejudice petitioner in light of the overwhelming evidence against him.  See Part III.B.1.a, supra.

Petitioner's claim that trial counsel was ineffective for failing to review grand jury minutes that could have been used to impeach the prosecution's witnesses fails because petitioner does not identify any grand jury testimony that is inconsistent with the testimony given at trial.

Lastly, petitioner's claims that trial counsel was ineffective for failing to consult with petitioner before and during the trial and request a lesser charge be submitted to the jury are completely meritless.  As far as consulting with petitioner, counsel noted on the record that he spoke and met with petitioner several times over the course of the trial (e.g., Tr. at 189-90, 416, 418-19, 526), and, at one point, counsel even requested a recess specifically so he could discuss trial strategy with petitioner (Tr. at 418-19).  Petitioner points to

no specific instance where counsel failed to discuss an aspect of the case with him, and, because it appears that counsel met with petitioner several times, petitioner's vague assertions that counsel did not consult him do not support an ineffective-assistance claim.

Likewise, although petitioner claims that his counsel was ineffective for failing to request a charge on a lesser included offense, the record reflects that during the charge conference, petitioner's counsel objected to the deletion of the charge for the lesser included offense of assault in the first degree and argued for the addition of an assault in the second degree charge. In addition, he renewed this request the following day (Tr. at 542-44, 549-54). Thus, there is no factual basis for this aspect of petitioner's claim.

Petitioner also seems to claim that counsel should have moved for the inclusion of a lesser included homicide charge (Petitioner's Memorandum of Law in[] Support of Writ of Habeas Corpus ("Pet. Memo.") at 56-57 (Docket Item 8)). Petitioner's claim must fail because he does not identify what homicide charge other than attempted murder in the second degree counsel should have requested, nor does it appear there are any lesser homicide offenses under New York law that would have been appropriate in this case. The only lesser homicide crimes in New York involve negligence or recklessness standards. Because an attempt crime

requires specific intent, however, one cannot attempt to commit a crime of negligent or reckless homicide.  <u>See</u> <u>Holmes v. Ricks</u>, 378 F. Supp.2d 171, 180-81 (W.D.N.Y. 2004) (counsel's failure to request <u>attempted</u> manslaughter or <u>attempted</u> criminally negligent homicide as lesser included offenses of attempted murder was not ineffective because no such crimes exist under New York law). Therefore, petitioner's claim that counsel should have requested a lesser homicide charge is meritless.

For the foregoing reasons, all of petitioner's specifications of ineffective assistance lack merit and the claim should be denied.

### 2. Timing of <u>Petitioner's Testimony</u>

Petitioner next claims that his Due Process rights were denied and that he was deprived the "guiding hand of counsel" when the Trial Court ruled that if petitioner chose to testify, he would have to do so at the beginning of the defense's case (Petition ¶ 12(A)).  At the close of the prosecution's case at approximately 11:00 a.m., the Judge asked petitioner if he was going to call any witnesses.  Petitioner's counsel responded that he had not expected the prosecution's case to end so early, that his first witness was not due to arrive in court until 1:00 p.m. and that he had no way of getting in touch with her before then. Hoping to make use of the remaining two hours of the morning

session, the Judge ordered that if petitioner intended on testifying, he would have to testify first or be precluded from testifying at all.  The order was made over petitioner's objection, and petitioner moved for mistrial, arguing that he was being forced to decide whether he was going to testify before he heard all the evidence (Tr. at 415-23).

The Appellate Division denied this claim on the merits, stating that the Trial Judge's ruling was a "proper exercise of discretion under the circumstances." People v. Smith, supra, 260 A.D.2d at 253, 690 N.Y.S.2d at 7.  Because the State Court denied this claim on the merits, upon habeas review the State Court's decision is entitled to deferential standard of review discussed at page 22, above.

Petitioner's reference to the "guiding hand of counsel" is based on the Supreme Court's decision in Brooks v. Tennessee, 406 U.S. 605 (1972), which struck down a Tennessee statute requiring a criminal defendant who wished to testify to do so at the beginning of the defense's case at trial.  The Supreme Court found, inter alia, that the Tennessee statute violated the Fourteenth Amendment as it deprived the petitioner of "the guiding hand of counsel" in aiding his decision of when to testify, if at all, during the trial.  Brooks v. Tennessee, 406 U.S. at 612-13.

The Brooks Court also stated that "[w]hile nothing we say here otherwise curtails in any way the ordinary power of a trial judge to set the order of proof, the accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand." Brooks v. Tennessee, supra, 406 U.S. at 613. Although it appears that this language limits a trial judge's discretion to set the order of proof insofar as deciding when a criminal defendant must testify, the Second Circuit, focusing on the first clause of the above quoted sentence, has found that this language demonstrates that Brooks did not create a per se prohibition against a trial judge's requiring a criminal defendant to testify at a particular time at trial.  See Harris v. Barkley, 202 F.3d 169, 173 (2d Cir. 2000) ("[W]e conclude that Brooks does not constitute a general prohibition against a trial judge's regulation of the order of trial in a way that may affect the timing of a defendant's testimony."); see also United States v. Singh, 811 F.2d 758, 762-63 (2d Cir. 1987) (trial judge has discretion to require defendant to testify first in order to lay a proper foundation for an otherwise inadmissible non-party witnesses' testimony).

In distinguishing Harris and Singh from Brooks, the Second Circuit emphasized that the order of proof in those cases, like the order of proof here, resulted from the trial judge's

discretion and was not mandated by statute as it was in Brooks.
Harris v. Barkley, supra, 202 F.3d at 173-74; United States v.
Singh, supra, 811 F.2d at 762-63. Nevertheless, there were
additional factors in Harris and Singh that suggest that neither
case stands for the proposition that the trial judge has
unbridled discretion to manage the order in which a criminal
defendant puts on his or her case.

For example, in Harris, the defendant testified second
out of the three defense witnesses, Harris v. Barkley, supra, 202
F.3d at 174; in this case, petitioner was the first of two
witnesses. The Court of Appeals in Harris also noted that the
trial judge in that case had instructed Harris to have his
witnesses available all day and that Harris had failed to do so.
Harris v. Barkley, supra, 202 F.3d at 174. In this case, at the
close of the previous day's testimony, the Court ordered the
prosecution to have its next witness ready at 10:00 a.m. and
petitioner, without objection from the Court, stated that he
would have his first witness ready at 2:00 p.m (Tr. at 389).
Thus, unlike Harris, petitioner here was not contravening a court
order.

Similarly, in Singh, the order of proof was not solely
the result of the trial judge's order. Singh v. United States,
supra, 811 F.2d at 762. In Singh, the trial court refused to
permit testimony from a defense witness without foundation

testimony to establish relevance; the trial court did not specify who could provide the foundation testimony. The defense unilaterally decided to call defendant to offer the foundation testimony. Singh v. United States, supra, 811 F.2d at 762-63. In this case, on the other hand, the Trial Judge's order left the defense with no alternative other than calling petitioner.

Despite the differences between Harris and Singh and this case, however, I still conclude that petitioner's claim fails. Harris and Singh establish that Brooks does not create a per se rule that invariably prohibits a trial judge from ever requiring a criminal defendant who chooses to testify in his defense to testify at a particular time at trial. Like Harris and Singh, petitioner's case was distinguishable from Brooks. The Trial Judge required petitioner to testify first as a matter of his discretion, not pursuant to a categorical rule. The apparent reason for the Trial Judge's decision was to prevent a protracted break in the proceedings until petitioner's other witness arrived. Respondent correctly argues that the Judge's decision was justified in this regard by the fact that there had been numerous delays in the trial resulting in dead time for the jury, for example, when petitioner did not appear in court one day because he suddenly became sick (Tr. at 6) and two other times when the Court was holding hearings on motions (6/13/96 Tr. at 62-65; Tr. at 102-04).

In addition, as the Appellate Division noted, petitioner made his decision to testify with the assistance of counsel, <u>People v. Smith</u>, <u>supra</u>, 260 A.D.2d at 253, 690 N.Y.S.2d at 7, and was even granted a recess to discuss his decision with counsel (Tr. at 418). Perhaps most importantly, petitioner was not prejudiced by the Judge's ruling. Because there was no significant overlap between petitioner's and Williams' testimony -- the bulk of her testimony addressed her interaction with Popp in her apartment when petitioner was not there -- it is doubtful that her testifying first would have had an impact on petitioner's decision whether to testify since petitioner's testimony addressed issues that Williams' testimony did not. The only notable overlap between the two witnesses' testimonies is that the two contradicted each other, petitioner testifying that he saw Williams in her apartment in the early evening of December 3, and Williams claiming that she was not home then. However, the purpose of permitting a criminal defendant to choose when to testify is to allow him to decide how to present his own case and determine whether testifying at a particular time, if at all, is good strategy, not so he can tailor his testimony to the evidence introduced earlier in the trial. Petitioner cannot therefore assert that the inconsistency is evidence of unfairness.

Thus, for all the foregoing reasons, I conclude that the Appellate Division's decision that the Trial Judge properly

acted within his discretion when he required petitioner, if he chose to testify, to testify immediately after the close of the prosecution's case was not an unreasonable application of Supreme Court precedent and that this claim should be denied.

### 3. Supplemental Jury Instruction

Petitioner next claims that he was denied a fair trial because the Trial Judge gave an improper supplemental instruction to the jury (Petition ¶ 12(B)).  Respondent argues that petitioner's claim is unexhausted because it was presented to the Appellate Division solely as a state law claim and never presented in any way to the New York Court of Appeals.  However, I decline to address whether petitioner's claim is unexhausted because I find it is without merit, even when reviewed de novo. See 28 U.S.C. § 2254(b)(2); see also Rhines v. Weber, 544 U.S. 269, 277 (2005) (noting that district courts have the discretion to deny unexhausted habeas claims on the merits); Pratt v. Greiner, 306 F.3d 1190, 1197 (2d Cir. 2002) (same); Lurie v. Wittner, 228 F.3d 113, 124 (2d Cir. 2000) (same).

During deliberations, the jury requested a re-reading and elaboration on the instructions concerning the intent element of attempted murder (Tr. at 638).  In the supplemental charge, the Judge stated:

In order to find the defendant guilty of attempted
murder in the second degree, you must find from all of
the evidence beyond a reasonable doubt both of the
following elements; first, that on or about December 3
of last year, in Manhattan, up there in that apartment,
the defendant intended; and that is, had a conscious
aim or objective -- that's what I mean by "intent;
intent" -- you intend something when you have an -- a
conscious aim or objective to do that.  That's what
intent mean[s]; a conscious aim or objective that at
that time, the defendant intended to cause the death of
Pauline Lawrence, [a]nd then, I went on to tell you
that it's not necessary that the intent to kill was
formed in the defendant's mind before he struck the
blow with the hammer.  It would be enough if you were
to find beyond a reasonable doubt that the defendant
had that intent; that is, an intent to kill Miss
Lawrence when he struck her with the hammer.  Okay.
And the second element that must be proven beyond a
reasonable doubt is that the defendant hit Miss
Lawrence with a hammer once or more times; and that
that act or acts constituted a substantial step toward
killing Miss Lawrence.  Okay.  <u>So</u>, <u>basically</u>, <u>it's</u> --
<u>when</u> <u>the</u> <u>defendant</u> <u>acted</u>, <u>when</u> <u>he</u> <u>hit</u> <u>Miss</u> <u>Lawrence</u>,
<u>the</u> <u>People</u> <u>must</u> <u>prove</u> <u>that</u> <u>at</u> <u>that</u> <u>time</u>, <u>he</u> <u>then</u>
<u>intended</u> <u>to</u> <u>kill</u> <u>Miss</u> <u>Lawrence</u>.  Okay.  All right.  You
may retire.

(Tr. at 638-39 (emphasis added)).  Petitioner claims that the

language emphasized above suggested to the jury that petitioner

was indeed Lawrence's attacker even though the prosecution was

required to prove identity beyond a reasonable doubt and

petitioner proffered an identity defense (Pet. Memo. at 59).

Jury instructions are issues of state law and as such,

rarely justify habeas relief.  <u>See</u> <u>Gilmore v. Taylor</u>, 508 U.S.

333, 344 (1993); <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991).

"For an erroneous state jury charge to result in a federal

constitutional deprivation, 'the ailing instruction by itself

[must have] so infected the entire trial that the resulting conviction violates due process.'" Balzic v. Henderson, 900 F.2d 534, 541 (2d Cir. 1990), quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973); accord Bell v. Coughlin, 778 F. Supp. 164, 176 (S.D.N.Y. 1991). "Although supplemental instructions require special consideration due to their prominence in the jury's mind . . . they must also be considered in the context of the entire charge." Santiago v. Artuz, 99 Civ. 4477 (KMW)(FM), 2003 WL 470569 at *10 (S.D.N.Y. Jan. 23, 2003) (Report and Recommendation), citing United States v. Tillem, 906 F.2d 814, 826 (2d Cir. 1990) and Arroyo v. Jones, 685 F.2d 35, 39 (2d Cir. 1982); cf. Cupp v. Naughten, supra, 414 U.S. at 146-47 ("In determining the effect of [an] instruction on the validity of [a petitioner's] conviction," it is a "well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."), citing Boyd v. United States, 271 U.S. 104, 107 (1926).

The supplemental instructions, when viewed in the context of the entire charge, did not eliminate the prosecution's burden to prove identity or suggest to the jury that the Judge had formed an opinion of whether petitioner was the attacker. The Trial Judge initially instructed the jury that the prosecution must prove beyond a reasonable doubt that "the

44

defendant is the one who committed these crimes" and if any
proffered alibi testimony created a reasonable doubt that
petitioner was Lawrence's attacker, the jury must find him not
guilty (Tr. at 619-20).  In response to the jury's request, the
Judge properly read and elaborated upon only those portions of
the instructions relevant to the request.  Having already given
instructions on identity and alibi and that the prosecution had
to prove each element beyond a reasonable doubt, the Judge was
not required to read back the entire charge or even the portion
on identity or alibi in responding to the note.

　　　　Given this context, the language used by the Judge, as
the Appellate Division stated, "could not have misled the jury to
believe that the central issue of identity had disappeared from
the case."  People v. Smith, supra, 260 A.D.2d at 254, 690
N.Y.S.2d at 7.  Assuming arguendo the supplemental charge even
was error, it certainly did not rise to the level of a
constitutional error by infecting the entire trial such that the
conviction violated Due Process, particularly in light of the
compelling evidence of petitioner's guilt.  See Lugo v. Kuhlmann,
68 F. Supp.2d 347, 374 (S.D.N.Y. 1999) (adopting Report and
Recommendation) ("Even if the supplemental charge was erroneous,
in light of the correct original charge and the compelling
evidence of Lugo's guilt, there is no indication that the
instruction so infected the entire proceeding as to result in a

45

denial of due process."). Because the supplemental jury charge did not infect the entire trial such that the conviction violates Due Process, I conclude that this claim should be denied.

         4.  Petitioner's Confession and
             Illegal Search and Seizure Claims

         Petitioner's remaining claims, that his post-arrest statement and jacket were illegally obtained (Petition ¶ 12(D)-(E)), are unexhausted but procedurally barred.

         It is fundamental that a state prisoner seeking to vacate his conviction on the ground that his federal constitutional rights were violated must first exhaust all available state remedies.  28 U.S.C. § 2254(b); Baldwin v. Reese, 541 U.S. 27, 29 (2004); Picard v. Connor, 404 U.S. 270, 275 (1971); Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 808 (2d Cir. 2000).  As the Court of Appeals has noted:

> If anything is settled in habeas corpus jurisprudence, it is that a federal court may not grant the habeas petition of a state prisoner "unless it appears that the applicant has exhausted the remedies available in the courts of the State; or that there is either an absence of available State corrective process; or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner."  28 U.S.C. § 2254(b)(1).

Aparicio v. Artuz, supra, 269 F.3d at 89.

         A two-step analysis is used to determine whether a claim has been exhausted:

First, the petitioner must have fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts. . . .

Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim.

Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981) (citations omitted), overruled on other grounds, Daye v. Attorney Gen., 696 F.2d 186, 191 (2d Cir. 1982) (en banc); see also Baldwin v. Reese, supra, 541 U.S. at 28; McKethan v. Mantello, 292 F.3d 119, 122 (2d Cir. 2002), quoting Ramirez v. Attorney Gen., 280 F.3d 87, 94 (2d Cir. 2001); accord Powell v. Greiner, 02 Civ. 7352 (LBS), 2003 WL 359466 at *1 (S.D.N.Y. Feb. 18, 2003); Alston v. Senkowski, 210 F. Supp.2d 413, 417 (S.D.N.Y. 2002); Boyd v. Hawk, 94 Civ. 7121 (DAB), 1996 WL 406680 at *3 (S.D.N.Y. May 31, 1996).

To satisfy the first element of the exhaustion test, a habeas petitioner must fairly present his federal claim to the state courts. Anderson v. Harless, 459 U.S. 4, 6 (1982); Cox v. Miller, 296 F.3d 89, 99 (2d Cir. 2002); Galarza v. Keane, 252 F.3d 630, 638 (2d Cir. 2001); Daye v. Attorney Gen., supra, 696 F.2d at 191. The claim is considered fairly presented when it has "informed [the State] courts of 'all the essential factual allegations' and 'essentially the same legal doctrine [asserted] in [the] federal petition.'" Strogov v. Attorney Gen., 191 F.3d

188, 191 (2d Cir. 1999), quoting Daye v. Attorney Gen., supra,
696 F.2d at 191-92.

To satisfy the second step of the analysis, "[a]
petitioner must present his federal constitutional claims to the
highest court of the state before a federal court may consider
the merits of the petition." Grey v. Hoke, 933 F.2d 117, 119 (2d
Cir. 1991); see also O'Sullivan v. Boerckel, 526 U.S. 838, 847-48
(1999). Exhaustion requires that a prisoner must even pursue
discretionary state appellate remedies before he can raise a
claim in a habeas corpus proceeding. O'Sullivan v. Boerckel,
supra, 526 U.S. at 846-48.

Unexhausted claims are deemed exhausted if the
petitioner no longer has any remedy available in the state
courts. Gray v. Netherland, supra, 518 U.S. at 161; Engle v.
Isaac, 456 U.S. 107, 124 n.28 (1982); Nevarez v. Artuz, 99 Civ.
2401 (LBS), 2000 WL 718450 at *3 (S.D.N.Y. June 5, 2000); Hurd v.
Stinson, 99 Civ. 2426 (LBS), 2000 WL 567014 at *7 (S.D.N.Y. May
10, 2000).

> This apparent salve, however, proves to be cold comfort
> to most petitioners because it has been held that when
> "the petitioner failed to exhaust state remedies and
> the court to which the petitioner would be required to
> present his claims in order to meet the exhaustion
> requirement would now find the claims procedurally
> barred," federal habeas courts also must deem the
> claims procedurally defaulted. Coleman v. Thompson,
> 501 U.S. 722, 735 n.1, 111 S.Ct. 2546, 115 L.Ed.2d 640
> (1991).

Aparicio v. Artuz, supra, 269 F.3d at 90.

In the absence of a showing of cause for and prejudice from the failure to raise the claim in conformity with state procedural requirements or a fundamental miscarriage of justice, such a claim, although deemed exhausted, will be forfeited and barred from serving as the basis for habeas relief.

> Where a petitioner has failed to present his or her federal claims to the state courts in accordance with state procedural requirements, and no longer has recourse to state review, he or she will be found to have met the exhaustion requirement of 28 U.S.C. §2254(b); however, the claims will be subject to procedural bar in this court.  See Coleman v. Thompson, 501 U.S. 722 (1991); Castille v. Peoples, 489 U.S. 346, 350 (1989); Teague v. Lane, 489 U.S. 288, 297-98 (1989).  If there is such a procedural bar, the claim cannot be heard absent a showing of cause for the procedural default and prejudice.  Wainwright v. Sykes, 433 U.S. 72 (1977).

Norwood v. Hanslmaier, 93 CV 3748, 1997 WL 67669 at *2 (E.D.N.Y. Feb. 11, 1997); see also Coleman v. Thompson, supra, 501 U.S. at 750 ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."); Engle v. Isaac, supra, 456 U.S. at 129 ("[W]hen a procedural default bars state litigation of a constitutional

49

claim, a state prisoner may not obtain federal habeas relief absent a showing of cause and actual prejudice.").

Here, petitioner's claims that his post-arrest statement and jacket were illegally obtained are unexhausted because petitioner did not raise either issue on appeal to the Appellate Division or the New York Court of Appeals. Nevertheless, this claim must now be deemed exhausted but procedurally barred from review because petitioner can no longer assert the claim in any state proceeding. As the Court of Appeals for the Second Circuit explained in Spence v. Superintendent, Great Meadow Corr. Fac., supra, 219 F.3d at 170:

> New York permits only one application for direct
> review, see N.Y. Rules of Court, Court of Appeals, §
> 500.10(a) (McKinney 1999), and having failed to raise
> the claim on direct appeal [petitioner] may not seek
> collateral relief in New York courts, see N.Y. Crim.
> Proc. Law. § 440.10(2)(c) (McKinney 1994); Strogov v.
> Attorney Gen., 191 F.3d 188, 193 (2d Cir. 1999);
> Washington, 996 F.2d at 1447; Grey, 933 F.2d at 120.
> Because [petitioner] failed to raise his claim in the
> ordinary appellate process and can no longer do so, it
> is procedurally defaulted.

See also Jones v. Keane, 329 F.3d 290, 296 (2d Cir. 2003); Aparicio v. Artuz, supra, 269 F.3d at 91; Black v. McGinnis, 99 Civ. 755 (MBM), 2001 WL 209916 at *4 (S.D.N.Y. Mar. 1, 2001).

These claims are also procedurally barred by an independent and adequate state ground. "A federal court generally may not review a state court decision that expressly relies on a procedural default as an independent and adequate

state ground for dismissal. This rule applies even where the state court provided an alternative ruling based on the merits of the claim." Rivera v. Moscicki, supra, 2005 WL 2347840 at *2, citing, inter alia, Coleman v. Thompson, supra, 501 U.S. at 735; see Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005). Petitioner asserted his claims regarding the statement and jacket for the first time by way of a motion to vacate under New York Criminal Procedure Law Section 440.10. In denying the motion, the State Court found that petitioner's claims were barred because they were "reviewable by the Appellate Division upon the record (CPL 440.10[2][c])" (440.10 Order).

Section 440.10(2)(c) bars collateral attacks attempting to raise claims that a defendant could have raised on direct appeal. See Sweet v. Bennett, 353 F.3d 135, 139-40 (2d Cir. 2003); Ramirez v. Attorney Gen., supra, 280 F.3d at 96; Spence v. Superintendent, Great Meadow Corr. Fac., supra, 219 F.3d at 170; Dowtin v. Cohen, 99-CV-323 (JBW), 2005 WL 697981 at *22 (E.D.N.Y. Mar. 25, 2005). Procedural bars pursuant to Section 440.10 have been upheld as being independent and adequate to preclude federal habeas corpus review. Sweet v. Bennett, supra, 353 F.3d 135, 141 (2d Cir. 2003); Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997); Williams v. Phillips, 02 CV 5882 (SJ), 2005 WL 1072711 at *8 (E.D.N.Y. Apr. 29, 2005). Because petitioner's claims are

procedurally barred by an independent and adequate state ground, they cannot be reviewed by this Court.

Petitioner could theoretically overcome the procedural bar by demonstrating either (1) cause for and prejudice from petitioner's failure to assert his claims in accordance with state procedural law or (2) that a failure to consider the claim would result in a fundamental miscarriage of justice. Schlup v. Delo, 513 U.S. 298, 324-27 (1995); Coleman v. Thompson, supra, 501 U.S. at 748-50; Harris v. Reed, 489 U.S. 255, 262 (1989); Green v. Travis, supra, 414 F.3d at 294. Petitioner has not, however, argued either of these grounds exist to overcome the procedural bar. Therefore, petitioner's claims that his post-arrest statement was illegally obtained and his jacket was recovered as a result of an unlawful search and seizure are procedurally barred from federal review.

IV.  Conclusion

Accordingly, for all the foregoing reasons, I respectfully recommend that petitioner's petition for a writ of habeas corpus be denied because the claims that (1) he received ineffective assistance of counsel, (2) was erroneously forced to testify, if he so chose to testify, at the beginning of the defense's case, and (3) the supplemental jury instruction resulted in an unfair trial are meritless. Furthermore, his

claims that his confession and jacket were unlawfully obtained
are unexhausted and procedurally barred.

Since petitioner has not made a substantial showing of
the denial of a constitutional right with respect to his
ineffective-assistance, supplemental instruction, post-arrest
statement and unlawful seizure claims, I also recommend that a
certificate of appealability not be issued for those claims.  28
U.S.C. § 2253.  To warrant the issuance of a certificate of
appealability, "petitioner must show that reasonable jurists
could debate whether . . . the petition should have been resolved
in a different manner or that the issues presented were adequate
to deserve encouragement to proceed further."  <u>Middleton v.
Attorneys Gen.</u>, 396 F.3d 207, 209 (2d Cir. 2005) (<u>per</u> <u>curiam</u>)
(internal quotation marks omitted); <u>see</u> <u>also</u> <u>Love v. McCray</u>, 413
F.3d 192, 195 (2d Cir. 2005) (<u>per</u> <u>curiam</u>).  For the reasons set
forth above, I conclude that there would be no difference of
opinion among reasonable jurists that petitioner's federal rights
were not violated with respect to his ineffective-assistance,
supplemental instruction, post-arrest statement and unlawful
seizure claims.

V.  <u>Objections</u>

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of
the Federal Rules of Civil Procedure, the parties shall have ten

500 Pearl Street, Room 1350, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Casey. FAILURE TO OBJECT WITHIN TEN (10) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. Thomas v. Arn, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        May 19, 2006

                                    Respectfully submitted,


                                    HENRY PITMAN
                                    United States Magistrate Judge


Copies mailed to:

Mr. Kareem Smith
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13024

Stephanie M. Carvlin, Esq.
52 Duane Street, 7th Floor
New York, New York 10007

Mark Dwyer, Esq.
Assistant District Attorney
New York County
One Hogan Place
New York, New York 10013