UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

KAREEM SMITH,                            :

               Petitioner,          :      01 Civ. 1363 (WHP)(HBP)

-against-                                :      MEMORANDUM AND ORDER

MICHAEL MCGINNIS,                        :

               Respondent.         :

------------------------------------------------------X

12/11/08

WILLIAM H. PAULEY III, District Judge:

        Kareem Smith ("Smith") brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On May 19, 2006, Magistrate Judge Henry B. Pitman issued a Report and Recommendation (the "Report") that the petition be denied. Both Petitioner and Respondent filed objections to the Report. Following the death of Judge Richard C. Casey, this case was reassigned to this Court. For the following reasons, this Court adopts Magistrate Judge Pitman's thorough and well-reasoned Report and denies the petition.

BACKGROUND

        Smith was convicted of attempted murder in the second degree by a jury in the New York State Supreme Court, New York County in 1996, and sentenced to a term of ten to twenty years. (Report at 1.)

I. Trial

        At trial, the victim, Pauline Lawrence ("Lawrence"), testified that she and Smith were friends and that Smith arrived at her apartment at approximately 8:00 p.m. on December 3,

1995. She further testified that at approximately 8:45 p.m., Smith attacked her with a hammer, hitting her several times. (Report at 2-4.) Lawrence testified that Smith made her take off her jewelry and give it to him. (Report at 3.) Lawrence also testified that Smith was wearing a camouflage army fatigue jacket. (Report at 2.) Another witness, who lived in Lawrence's building, saw Smith, wearing the camouflage jacket, attack Lawrence after she escaped from her apartment to the hallway. (Report at 3.) After Lawrence gave Detective Richard Popp ("Popp"), a description and address for Smith, Popp went to Smith's apartment on 104th Street in Manhattan. (Report at 5.) While Smith was not at the apartment, Elizabeth Williams ("Williams"), the owner of the apartment and Smith's cousin, gave Popp permission to take a brown camouflage army jacket that was in plain view inside an open closet. (Report at 5.) When Popp picked up the jacket, he noticed a blood stain on its sleeve. (Report 5.)

      Smith was arrested and taken into custody. Popp read Smith his <u>Miranda</u> rights and Smith signed a statement acknowledging his receipt and understanding of the warnings. (Report at 6.) Smith then proceeded to give a statement, which he later wrote out and signed, regarding the events of December 3, 1995, including that he had hit Lawrence multiple times with a hammer and chased her out of her apartment. (Report at 7.)

      When the prosecution rested at approximately 11:00 a.m., the trial judge inquired of Smith's counsel whether he would be calling any witnesses and presenting a defense case. (Report at 36.) Smith's counsel responded that he had not expected the prosecution's case to end so early and that, as he had indicated on the previous day without objection, the defendant's first witness was not expected in court until 1:00 p.m. (Report at 36.) Apparently because of several delays during trial, including one attributable to Smith's illness, the trial judge declined to grant a continuance until 1:00 p.m. (Report at 40.) Instead, the trial judge asked Smith's counsel

whether Smith was going to take the stand. When Smith's counsel advised the trial judge that Smith would testify, the trial judge instructed him to put his client on the stand before lunch, or face preclusion of Smith's testimony. (Report at 37.) After arguing that defendant was being forced to decide whether to testify before hearing all the evidence, Smith's counsel called him to the stand and Smith testified. (Report at 37.)

Smith offered different testimony than Lawrence. He testified that testified that he left Lawrence's apartment between 6:45 and 7:00 p.m. and went to Williams' apartment to visit his girlfriend Shamika Smith ("Shamika"). He then visited the apartment of another girl he was dating, Latesha Tucker ("Latesha"), in Brooklyn. (Report at 8-9.) He testified that Latesha, Sabrina Tucker, Cookie Tucker, Shawn Tucker, Juan Derrick Tucker, and Juan Derrick Tucker's girlfriend, Keisha, all saw him at Latesha's apartment and that he left around 1:00 a.m. on December 4. (Report at 9.) None of those individuals testified at the trial. Smith suggested that Lawrence's claim that he had attacked her stemmed from her mistaken impression that Smith was withholding thousands of dollars of clothing and jewelry they obtained in a check and credit card fraud. (Report at 9.) As for the statement he gave Popp, Smith testified that Popp continuously asked Smith to give a statement, in spite of the fact that Smith asked for a lawyer. (Report at 10.) According to Smith, he finally yielded to Popp and wrote a statement as instructed, but Popp never read him his Miranda rights and he only signed the form acknowledging the Miranda warnings after he signed his statement. (Report at 10-11.)

After Smith, Williams testified that she was not at her apartment on the evening of December 3, 1995 at the time Smith testified he saw her there. (Report at 11.) Williams also testified that the door to the closet in her apartment was closed and that she only let Popp take the camouflage army jacket because he told her he had a warrant. (Report at 12.) However, on

cross-examination, Williams admitted that Popp never told her he had a warrant; rather, she believed he did because he held a file in his hand. (Trial testimony of Elizabeth Williams at 518-19.) Smith intended to call Shamika as an alibi witness, but she did not respond to a subpoena. (Report at 12.)

Two charges were submitted to the jury: attempted murder in the second degree and robbery in the first degree. (Report at 12.) The jury convicted Smith on the attempted murder charge, but acquitted him on the robbery charge. (Report at 12.)

II. Pre and Post-Trial Proceedings

Prior to the trial, Smith moved to suppress the jacket and his post-arrest written statement at a Mapp/Huntley hearing. He argued that: the jacket was unlawfully seized; he was not given his Miranda warning; he requested counsel several times before making his statement; and the statement was not based on his own recollection, but from Popp's recounting of what had occurred. (Report at 13.) The trial judge denied the motion after hearing testimony from Smith and Popp. After Williams' testimony at trial, counsel requested that the court reconsider the suppression issue with regard to the jacket, but the trial judge denied the request. (Trial transcript at 531-32.)

After trial, Smith appealed his conviction to the Appellate Division, First Department on several grounds, including, inter alia, that he was denied his right to remain silent, due process rights, and the right to the "guiding hand of counsel" when the trial judge required him to testify before any other defense witness. The Appellate Division, First Department affirmed the conviction and the Court of Appeals denied leave to appeal. (Report at 14.) Smith also filed a motion to vacate the judgment arguing: (1) ineffective assistance of

4

counsel; (2) that the jacket was obtained by unlawful search and seizure; and (3) that his post-arrest statement was unlawfully obtained. (Report at 15.) The trial court held that the claims were either reviewable by the Appellate Division on the record or previously determined on the merits on appeal. (Report at 15.)

Smith asserts five claims in this petition. On November 15, 2004, Magistrate Judge Pitman held an evidentiary hearing on Smith's claim that he received ineffective assistance of counsel based on his counsel's failure to offer alibi witnesses. Smith was represented by counsel, appointed by Magistrate Judge Pitman, on the issue addressed at the evidentiary hearing. (Report at 17.) At the hearing, Smith called Latesha, Sabrina, and Juan Derrick Tucker. All three testified that neither Smith's counsel nor his investigator ever interviewed them. (Report at 19.) Latesha testified that she did not remember the exact date, but that she did recall that Smith arrived at her apartment between 5:00 and 8:30 p.m. on the night of the attack and that he stayed for four hours. (Report at 17.) She also testified that she did not speak with Smith after he was arrested; however, this contradicted Popp's notes which indicated that when Latesha was interviewed she stated that Smith had called her from jail to ask her to say that he had arrived at her house at 5:00 p.m. (Report at 18.) Sabrina testified that she could not remember when she last saw Smith. (Report at 18.)

## DISCUSSION

I. Standard of Review

The Court reviews the findings and recommendations of a magistrate judge and "may accept, reject, or modify [them], in whole or in part." 28 U.S.C. § 636(b)(1). The Court reviews de novo those parts of the Report to which objections are made, and reviews the

remainder for clear error on the face of the record. 28 U.S.C. § 636(b)(1); Nelson v. Smith, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985).

Where a state court has adjudicated the merits of a claim raised in a federal habeas corpus petition, a writ of habeas corpus may issue only if the state court's adjudication resulted in a decision that (1) "was contrary to . . . or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d); see also Williams v. Taylor, 529 U.S. 362, 364 (2000); Francis v. Stone, 221 F.3d 100, 107-08 (2d Cir. 2000). A decision is "contrary to" clearly established law if it "applies a rule that contradicts the governing law set forth in [the Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of the [Supreme Court] and nevertheless arrives at a result different from [the] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision involves an unreasonable application of clearly established federal law where the petitioner can show that the "state court applied [the clearly established law] to the facts of his case in an objectively unreasonable manner." Woodford v. Viscotti, 537 U.S. 19, 24-25 (2002). "Unreasonableness is determined by an objective standard." Gersten v. Senkowski, 426 F.3d 588, 607 (2d Cir. 2005) (internal quotation marks and citation omitted). "Some increment of incorrectness beyond error" is required. Henry v. Poole, 409 F.3d 48, 68 (2d Cir. 2005). If the state court has not resolved a claim on the merits, the state court's decision is subject to de novo review. Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003).

In addition, a habeas petitioner must first exhaust all state remedies. Ramirez v. Attorney General of State of New York, 280 F.3d 87, 94 (2d Cir. 2001). "State remedies are

deemed exhausted when a petitioner has: (i) presented the federal constitutional claim asserted in the petition to the highest state court (after preserving it as required by state law in lower courts) and (ii) informed that court (and lower courts) about both the factual and legal bases for the federal claim." Ramirez, 280 F.3d at 94. If a petitioner failed to present the claim to the highest state court or preserve it in the lower state courts, it is deemed exhausted if, as a result, it is procedurally barred. Ramirez, 280 F.3d at 94. A habeas court cannot consider a procedurally barred claim unless there is a showing of cause and prejudice or a showing of a fundamental miscarriage of justice. Ramirez, 280 F.3d at 94. A procedural default is an affirmative defense that is waived if not raised. Gray v. Netherland, 518 U.S. 152, 165-66 (1996).

II. Ineffective Assistance of Counsel

  In order to prevail on an ineffective assistance of counsel claim, a petitioner must show both that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 686-87 (1984). For the second prong, petitioner must show that but for trial counsel's performance there is a "reasonable probability"—"a probability sufficient to undermine confidence in the outcome"—that the outcome of the trial would have been different. Strickland, 466 U.S. at 694. "Even serious errors by counsel do not warrant granting habeas relief where the conviction is supported by overwhelming evidence of guilt." Lindstadt v. Keane, 239 F.3d 191, 204 (2d Cir. 2001).

  Smith argues that his trial counsel was ineffective because he failed to: (1) investigate and call witnesses supporting petitioner's alibi defense; (2) investigate and call additional witnesses during pre-trial hearings; (3) proffer exculpatory documentary evidence and alibi witness statements; (4) review and impeach witnesses with grand jury testimony; (5)

discuss trial strategy with Smith; and (6) request submission of a lesser included offense to the jury.

As an initial matter, Smith's ineffective assistance claim is procedurally barred because it was not raised on his direct appeal. However, because respondent did not assert this defense, it is waived and the Court moves on to de novo review.

A. Witnesses

While Smith claims that his trial counsel originally gave notice that he had seven alibi witnesses, Smith called only three potential alibi witnesses at the evidentiary hearing held by Magistrate Judge Pitman. Of those three, only one—Latesha— testified that Smith was at her home at the time of the attack. However, her testimony was vague—that Smith arrived at her apartment sometime between 5:00 and 8:30 p.m.—and a jury would have to consider her potential bias as Smith's girlfriend. In addition, Latesha's testimony would have been subject to impeachment if she had testified, as she did before Magistrate Judge Pitman, that Smith had not called her from jail and asked her to say that he was at her apartment at 5:00 p.m. on the night of the attack. Moreover, Latesha's testimony would have made little difference because the evidence at trial implicating Smith was overwhelming. It was undisputed that Lawrence was hit with a hammer multiple times. Lawrence knew Smith well and identified him as the attacker. While Smith raised potential explanations for why Lawrence would falsely accuse him, the jury did not credit them. The fact that Lawrence identified Smith as the perpetrator immediately after the incident suggested that she was not falsely accusing him.

Smith argues that the fact that the jury did not convict him of the robbery charge, in spite of Lawrence's testimony that Smith took her jewelry, suggests that the jury only credited the remainder of Lawrence's testimony because it was corroborated. Even if this is true,

Latesha's testimony would not have led to a different outcome. Lawrence's testimony was corroborated by another witness who testified that the attacker wore an army fatigue coat, which was recovered from Smith's apartment with a blood stain, and by Smith's signed written statement that he had hit Lawrence with a hammer. Accordingly, Smith was not prejudiced by any alleged failure of his trial counsel to investigate or call alibi witnesses.

 B. Remaining Ineffective Assistance Claims

  1. Witnesses During Pre-trial Hearings

   Williams is the only witness Smith argues was not presented at the pre-trial suppression hearing. Williams would not have offered any testimony regarding Smith's statement to the police and, therefore, her testimony would not have any effect on the outcome of the pre-trial suppression hearing on that issue. Second, the trial court credited Popp's testimony regarding his seizure of the jacket from Williams' apartment. There is no evidence that Williams' testimony would have resulted in a different outcome. While Williams may have believed that Popp had a warrant, she admitted at trial that Popp never told her he had a warrant. Moreover, Smith cannot show any prejudice from Williams' failure to testify at the suppression hearing because while trial counsel requested that the trial court reconsider the suppression issue after Williams' testimony, the court declined that request.

  2. Exculpatory Documentary Evidence

   Smith also claims that his attorney should have offered a lab report that was inconclusive as to the blood type found on Smith's jacket and the fact that Smith's fingerprints were not found on the hammer retrieved from the crime scene. However, this evidence is inconclusive; it does not exculpate Smith. In light of the overwhelming evidence at trial of his guilt, Smith fails to demonstrate that this evidence would have led to a different result.

Smith does not object to Magistrate Judge Pitman's recommendation on his remaining ineffective assistance claims.

III. Timing of Smith's Testimony

In Brooks v. Tennessee, the Supreme Court struck down a Tennessee statute requiring a criminal defendant who wished to testify to do so at the beginning of the defense case, holding that the statute both violated the defendant's right to remain silent and due process rights. 406 U.S. 605 (1972). The Supreme Court stated: "[w]hile nothing we say here otherwise curtails in any way the ordinary power of a trial judge to set the order of proof, the accused and his counsel may not be restricted in deciding whether, and when in the course of presenting his defense, the accused should take the stand." Brooks, 406 U.S. at 613. In Harris v. Barkley, the trial judge directed the defendant to testify second, rather than third, after his counsel had failed to follow the trial judge's instructions to have all three witnesses available on that day. 202 F.3d 169 (2d Cir. 2000). In denying the petition for habeas corpus, the Court of Appeals held that "Brooks does not constitute a general prohibition against a trial judge's regulation of the order of trial in a way that may affect the timing of a defendant's testimony." Harris, 202 F.3d at 173. In light of Harris, this Court cannot find that the trial judge's use of discretion to require Smith to testify before Williams was "contrary to . . . or involved an unreasonable application of" Brooks.

IV. Remaining Claims

Smith does not object to Magistrate Judge Pitman's recommendation on his remaining claims. Respondent argues that several claims should have been denied on additional grounds. However, this Court finds that the remainder of the Report is not facially erroneous, and affirms and adopts it and declines to consider the additional grounds asserted by Respondent.

CONCLUSION

This Court adopts the Report of Magistrate Judge Henry B. Pitman. Accordingly, Smith's petition is denied. The Clerk of the Court is directed to terminate all pending motions and mark this case as closed.

To warrant the issuance of a certificate of appealability, "petitioner must show that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that issues presented were adequate to deserve encouragement to proceed further." Middleton v. Attorneys Gen., 396 F.3d 207, 209 (2d Cir. 2005). This Court finds that "jurists of reason would [not] find it debatable" that, with the exception of claim relating to the timing of Smith's testimony at trial, the petition should be resolved in a different manner. See Slack v. McDaniel, 529 U.S. 473, 483 (2000). However, with respect to the trial judge's direction to defense counsel that Smith testify before any other defense witnesses, this Court finds the reasonable jurists could resolve that issue differently. Accordingly, the Court grants a certificate of appealability on that issue, namely whether Smith's due process rights, including a defendant's right to remain silent were violated when the trial judge declined to grant a two-hour continuance and required the defendant to testify or face preclusion.

Dated:   December 11, 2008
         New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Copies Mailed to*:

Stephanie M. Carvlin, Esq.
111 Broadway
Suite 701
New York, NY 10006
*Counsel for Petitioner*

Mark Dwyer, Esq.
Robert M. Morgenthau, Esq.
District Attorney, New York County
One Hogan Place
New York, NY 10013
*Counsel for Respondent*